George POWELL, et al., Plaintiffs,

v.

**CAREY INTERNATIONAL, INC.,
et al., Defendants.**

Case No. 05–21395–CIV.

United States District Court,
S.D. Florida.

March 12, 2008.

Chris Kleppin, Harry O. Boreth, Glasser Boreth Ceasar & Kleppin, Plantation, FL, for Plaintiffs.

Alexander D. Del Russo, Carlton Fields, P.A., West Palm Beach, FL, Kristy Marie Johnson, Patricia Halvorson Thompson, Michael Adam Shafir, Carlton Fields, Miami, FL, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND DENYING DEFENDANTS' MOTION FOR SANCTIONS AND PLAINTIFFS' THREE MOTIONS FOR SANCTIONS*

PATRICIA A. SEITZ, District Judge.

THIS MATTER is before the Court on five separate motions: (1) Plaintiffs' Motion for Attorneys' Fees [DE 486]; (2) Defendants' Motion for Sanctions Against Plaintiffs' Counsel [DE 487]; (3) Plaintiffs' Motion for Sanctions Against Defense Counsel and Motion to Strike Defendants' Response to Plaintiffs' Motion for Attorneys' Fees [DE 512, 514]; (4) Plaintiffs' Motion for Sanctions Against Non–Party Samuel Terilli [DE 513]; and Plaintiffs' Motion for Sanctions Against Defendants [DE 532].[1] Plaintiffs' seek attorneys' fees in the amount of $481,887. Defendants, on the other hand, argue that Plaintiffs are not entitled to any fees, or alternatively, a significantly reduced sum. Having reviewed the motions, the supporting documents, the relevant legal authorities, and having observed the conduct of all counsel in this case, Plaintiffs' counsel shall be awarded $88,623.15.

## I. Background

Plaintiffs, limousine drivers, originally filed this wage and hour case under the Fair Labor Standards Act ("FLSA") on May 24, 2005.[2] Although Plaintiffs had employment agreements which denominated them as independent contractors, the Defendants elected to defend on the ground that Plaintiffs were employees (1) exempt under either (a) the motor carrier exception or (b) the taxicab exception, or in the alternative, that (2) the amount of unpaid overtime under the FLSA was significantly less than Plaintiffs demanded. After extensive, acrimonious litigation, by April 30, 2007, on the eve of trial, all 15 Plaintiffs remaining in the case had accepted offers of judgment.[3] The Court entered the following judgments for each Plaintiff: (1) Juan Alba—$25,395; (2) Carlos Betancourt—$2,500; (3) Mark Donahay—$2,500; (4) John Humphreys—$26,541; (5) Viliam Kralovic—$2,500; (6) Luis Lozaro—$4,750; (7) Miomir Maksimcev—$50,548; (8) Eduardo Mazzeo—$29,998; (9) Alphonso McIntyre—$5,500; (10) Wilhelm Pereira—$29,540; (11) Oscar Perez—$31,593; (12) George Powell—$15,530; (13) Francisco Rengifo—$62,235; (14) Errol Robinson—$2,510; and (15) Anousheh Sarfaraz—$2,500. The sum of these judgments is $294,140.

---

1. Defendants' motion for sanctions makes the same arguments included in their response to Plaintiffs' motion for attorneys' fees. Having discussed all the issues addressing Plaintiffs' motion for fees, the Court will deny as duplicative Defendants' motion for sanctions [DE 487]. Plaintiffs have also moved for sanctions against defense counsel based upon Defendants' motion for sanctions [DE 532]. However, because Plaintiffs' motion commits the same sin as Defendants' motion for sanctions, the Court will deny it, thus administering equal treatment for the same conduct.

2. Eight of the Plaintiffs are also involved in a lawsuit against the same Defendants for retaliation under the FLSA. *See Perez v. Carey International, Inc.*, Case No. 06–22225–Civ–Seitz/McAliley ("*Perez*").

3. The Court severed and compelled eight separate Plaintiffs to arbitration on November 15, 2006, and their claims remain pending. (*See* DE 240.)

As prevailing Plaintiffs under the FLSA, Plaintiffs and their counsel seek $481,887[4] in attorneys' fees for a portion of the work involved in obtaining judgments on their FLSA overtime claims. Defendants vigorously object to the award of any fees in this matter and alternatively argue that if fees are awarded that the amount should be significantly less than what Plaintiffs request. Defendants reiterated their arguments in a motion for sanctions. Plaintiffs responded with three motions for sanctions against Defendants' counsel and a third party. Because the various sanctions motions duplicate the points raised in the motion for attorneys' fees or relate thereto, all five motions shall are addressed together.

## II. Discussion

■ In the United States, the "American Rule" provides that, absent a contrary direction from Congress, the prevailing party in a litigation is not ordinarily entitled to recover attorney's fees from his opponent. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The FLSA, however, explicitly provides that a court "shall, in addition to any judgment awarded to plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). Thus, fee awards are mandatory for prevailing plaintiffs in FLSA cases. *See Kreager v. Solomon & Flanagan, P.A.,* 775 F.2d 1541, 1542 (11th

Cir.1985); *Shelton v. Ervin,* 830 F.2d 182, 184 (11th Cir.1987) ("Section 216 provides for an award of attorney's fees, as opposed to granting the court discretion in awarding such fees, to the prevailing plaintiff in FLSA cases."). The Supreme Court has held that a party is a "prevailing party" for purposes of an attorney's fee award if the party "succeeded on any significant claim affording it some of the relief sought." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 791, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). There is no meritorious dispute that Plaintiffs, who all accepted offers of judgment, are the prevailing parties in this action with respect to their FLSA overtime claims, and as such, are entitled to an award of reasonable attorneys' fees.

■ In the Eleventh Circuit, the framework for awarding attorney's fees to prevailing plaintiffs rests on *Norman v. Hous. Auth. of the City of Montgomery,* 836 F.2d 1292 (11th Cir.1988) and *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The fee award analysis begins with a determination of the "lodestar." This lodestar is the number of hours reasonably expended in a litigation multiplied by a reasonable hourly rate. *See e.g. Hensley,* 461 U.S. at 433, 103 S.Ct. 1933; *Norman,* 836 F.2d at 1299. While the "lodestar" method effectively replaced the balancing test previously prescribed by *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974),[5]

---

**4.** The breakdown of Plaintiffs' fee request is as follows:

| | |
|---|---|
| Lloyd Glasser ("Glasser"): | $ 21,915 ($450/hours × 48.7 hours) |
| Harry Boreth ("Boreth"): | $ 45,630 ($450/hour × 101.4 hours) |
| Chris Kleppin ("Kleppin"): | $414,342 ($270/hour × 1,534.6 hours) |
| **Total** | **$481,887** |

Note: Plaintiffs incorrectly calculate the sum of fees for Glasser and Boreth to be $60,750 when the correct calculation is $67,545. (Plaintiffs' Motion at 11.) However, the amount of total fees sought for all attorneys reflects the correct number.

**5.** All decisions of the former Fifth Circuit rendered prior to October 1, 1981 serve as binding precedent on the current Eleventh Circuit. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981).

the twelve *Johnson* factors [6] "might still be considered in terms of their influence on the lodestar amount." *Norman,* 836 F.2d at 1299. The burden of establishing the number of hours reasonably expended lies with the plaintiff, and "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933; *see also Norman,* 836 F.2d at 1303. Similarly, a plaintiff has the burden of establishing that the hourly rate requested is a reasonable one. *Loranger v. Stierheim,* 10 F.3d 776, 781 (11th Cir.1994).

■ The determination of reasonableness lies in the sound discretion of the trial court. *Norman,* 836 F.2d at 1301. In determining whether the number of hours expended on the litigation was reasonable, the district court should exclude from its initial fee calculation "hours that are excessive, redundant, or otherwise unnecessary." *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. Also, in making this calculation, the court should exclude "time spent on discrete and unsuccessful claims." *Norman,* 836 F.2d at 1302. "The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933. Fee applicants are required to exercise "billing judgment" and exclude these hours from their fee application.

*ACLU of Ga. v. Barnes,* 168 F.3d 423 (11th Cir.1999). "If fee applicants do not exercise billing judgment, courts are obligated to do it for them, to cut the amount of hours for which payment is sought, pruning out those that are 'excessive, redundant, or otherwise unnecessary.'" *Id.*

■ When determining a reasonable hourly rate, the rate should be "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman,* 836 F.2d at 1299. "Evidence of rates may be adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence." *Id.* On the issue of a reasonable rate, a court is itself considered an expert and can make an informed judgment as to a proper award of fees even without the benefit of outside testimony. *Id.* at 1303; *see also Loranger,* 10 F.3d at 781.

"The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. "There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has

---

**6.** The twelve *Johnson* factors are:
1) the time and labor required;
2) the novelty and difficulty of the questions;
3) the skill requisite to perform the legal service properly;
4) the preclusion of other employment by the attorney due to acceptance of the case;
5) the customary fee;
6) whether the fee is fixed or contingent;
7) time limitations imposed by the client or the circumstances;
8) the amount involved and the results obtained;
9) the experience, reputation, and ability of the attorney;
10) the "undesirability" of the case;
11) the nature and length of the professional relationship with the client; and
12) awards in similar cases.

*Johnson,* 488 F.2d at 717–19.

discretion in making this equitable judgment." *Hensley,* 461 U.S. at 436–37, 103 S.Ct. 1933. The most important factor to consider is the result obtained. *Id.* at 436, 103 S.Ct. 1933. If the success was limited or the plaintiff's victory was limited, the lodestar must be reduced to reflect the limited result. *Norman,* 836 F.2d at 1302; *see also Popham v. City of Kennesaw,* 820 F.2d 1570, 1579–80 (11th Cir.1987). Fee awards, however, should not simply be proportionate to the results obtained by a plaintiff. *Andrews v. United States,* 122 F.3d 1367, 1376 (11th Cir.1997) (citing *Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)). "Given the nature of claims under the FLSA, it is not uncommon that attorneys' fee requests will exceed the amount of judgment in the case.'" *Tyler v. Westway Auto. Serv. Ctr., Inc.,* Case No. 02–61667–CIV–DIMITROULEAS/TORRES at 9 (S.D.Fla. Mar. 10, 2005) (quoting *Holyfield v. F.P. Quinn & Co.,* 1991 WL 65928, *1 (N.D.Ill. April 21, 1991) (court awarded approximately $7,000 in fees even though the judgment was only $921)); *see also Davis v. Locke,* 936 F.2d 1208, 1215 (11th Cir.1991) (quoting *Rivera,* 477 U.S. at 574, 106 S.Ct. 2686) (" 'Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms.' "). Before turning to the Eleventh Circuit "lodestar" analysis, it is necessary to discuss Plaintiffs' lead counsel's conduct in this case as it bears directly on the proper hourly rate and the amount of hours for which he should be compensated.

## A. Plaintiffs' Counsel's Conduct

As mentioned, Plaintiffs' counsel's fees request of $481,887, which is $187,747 more than Plaintiffs' total recovery, is premised on 1,534.6 hours for Kleppin's time at $270 per hour and 150.1 hours of Glasser and Boreth's time at $450 per hour. While these were not the-run-of-the-mill FLSA cases, they did not involve complicated issues. Unfortunately, Plaintiffs' counsel was never able to grasp or was unwilling to acknowledge the simple legal nature of this case. While Defendants did vigorously raise exemption bars, they did not contest that Plaintiffs should be treated as employees. Thus, the simple triable issue was the number of compensable hours for each Plaintiff. Even responding to Defendants' strenuous defense, this case could have and should have been litigated in less than a third of Kleppin's time. The disturbing undercurrent in this case from the outset has been on what will ultimately generate the greatest fees rather than legitimate recovery for Plaintiffs.

Furthermore, Plaintiffs' counsel's lack of understanding of the substantive and evidentiary law, repeated failures to comply with Court directions and rules, as well as their failure to exercise the critically important independent judgment, prolonged the litigation and generated unnecessary work for both counsel and the Court. This fact bears significantly on the appropriate hourly rate and number of hours that the Court can consider as reasonable in light of the nature of the case. Two examples of Plaintiffs' counsels' behavior which excessively multiplied the time and labor expended and underscored counsel's lack of experience and independent judgment were counsel's actions regarding damage estimates and motion practice.

### 1. Damage Estimates

Plaintiffs' counsel's unrealistic and legally unsupportable damage calculations derailed settlement negotiations prior to suit, required the hiring of experts and mandated numerous pretrial hearings and briefings and ultimately the appointment of a special master. Such actions require a

reduction in the attorneys' fee award. *See Carlson v. Bosem,* Case No. 04–61004–Civ–Zloch at 7, 2007 WL 1496693 (S.D. Fla. April 9, 2007) (reducing the plaintiff's attorneys' fee award based on the plaintiffs' counsel's abuse of the judicial process including his refusal to give the defendants estimates of damages and his refusal to communicate with opposing counsel and execute his duties to his client). As discussed below, Plaintiffs' attorneys have undertaken similar actions in this case as the plaintiff's attorney in *Carlson.*

### a. Plaintiffs' Unrealistic Damage Demands

Both before and throughout the litigation of this case, Plaintiffs' damage assessments and demands have been patently unreasonable and without legal or evidentiary foundation. Counsel's stubborn refusal to calculate damages realistically precluded pursuit of settlement, unnecessarily prolonged the litigation and increased costs. Several months before the initiation of this action, on February 4, 2005, Plaintiffs submitted a settlement demand for the original five Plaintiffs in an amount in excess of $800,000.[7] (Defendants' Opposition, Ex. 3.) After receiving counteroffers from Defendants in the amount of $34,000, Plaintiffs made counteroffers as to the original five Plaintiffs of approximately $550,000, but requested more than $380,000 for two additional Plaintiffs. (Defendants' Opposition, Ex. 7.) Defendants increased their offer to almost $80,000, plus a lump sum of $30,000 in attorneys'

fees. Plaintiffs rejected the offer and filed suit. (Defendants' Opposition, Ex. 8.)

On August 30, 2005, Plaintiffs gave Defendants their Rule 26 initial disclosures which claimed damages for six Plaintiffs in an amount in excess of $2.8 million. This demand more than tripled the original demands, yet did not include liquidated damages. (Defendants' Opposition, Ex. 9.) Recognizing the problems associated with the disclosures, Magistrate Judge McAliley ordered Defendants to produce to Plaintiffs payroll and trip information for the three years preceding the commencement of this action. (*See* DE 152.) The Magistrate Judge's Order also required the Plaintiffs to file a statement of damages based on Defendants' documents in an "easily readable chart that includes the amount of attorney's fees (hours and rate) incurred to date." Moreover, during this same period of time, because additional Plaintiffs joined the lawsuit (*see* DE 155, 167), Defendants sought additional damage estimates. (Defendants' Opposition, Ex. 12–26.) Plaintiffs responded with calculations on a per Plaintiff basis that resulted in total damages exceeding $15 million, not including attorneys' fees.[8] (*See id.*)

Notwithstanding the "calculations" purporting to support total damages of $15 million for the 15 Plaintiffs, not including attorneys' fees, Plaintiffs' counsel's actions delayed the resolution of the action for two years and actually resulted in Plaintiffs Powell, Betancourt, McIntyre and Sarfaraz receiving *less than they would have received had they settled their claims prior*

---

7. It was later determined that one of the original five Plaintiffs, Roberto Alas Zarceno, who was incorrectly identified as Robert Alan, had not worked for Defendants since 2000, and thus, did not have any claims.

8. For example, with regard to Plaintiff Alba, the calculations are based on the proposition that Alba worked 13 hours a day, 7 days a

week for over two years, with a few weeks for vacation. (Defendants' Opposition, Ex. 12.) Additionally, according to Plaintiffs' calculations, Plaintiff Maksimcev worked 15 hours a day, 7 days a week for over two years, with a few weeks for vacation. (Defendants' Opposition, Ex. 18.)

*to instigating this action.*[9] (*See* Defendants' Opposition, Ex. 8; DE 444, 452, 427, 451.) Notably, Plaintiff McIntyre received over $27,000 less than the original May 13, 2005 offer and Plaintiff Sarfaraz received over $11,000 less than the initial offer.

### b. Plaintiffs' Failure to Provide Legal or Evidentiary Support for their Damage Calculations

Not only were Plaintiffs' damage estimates unrealistic, they were also calculated using a formula that the Court previously rejected. (*See Foody v. Carey International,* 04–21104–Civ–Ungaro, November 10, 2004; DE 32.). In *Foody,* a case identical to the one at bar as to Defendants and in which both Kleppin and Boreth were counsel of record for the plaintiffs, Judge Ungaro rejected the plaintiffs' argument that overtime should be calculated pursuant to 29 C.F.R. § 778.109, and ruled that 29 C.F.R. § 778.112 governed the calculation of overtime for limousine drivers. The difference between the application of the two regulations is sizeable as the former calculates overtime wages at time and a half, and the latter calculates them using a half rate.[10] Thus, notwithstanding the fact that this legal issue had been previously determined under identical circumstances, Plaintiffs did not implement this method when estimating damages during both the settlement negotiations prior to suit and throughout the litigation.

In addition to the fact that there was no legal support for their calculations, Plaintiffs also lacked evidentiary support for their weekly hours estimates. In their initial responses to interrogatories, Plaintiffs stated that because Defendants did not keep records of Plaintiffs' hours, they were entitled to estimate their hours, and based on this methodology, Plaintiffs submitted average weekly hour estimates. However, it became patently clear that such estimates were not based on any identifiable factual foundation. Yet, less than a year after filing the interrogatory responses, in a remarkable about face on the eve of trial, Plaintiffs were able to provide specific calculations of work hours on a weekly basis. (*See* DE 431.)

Upon reviewing Plaintiffs' damage estimates, Defendants retained an expert in an effort to generate realistic damage calculations. It was only after seeing Defendants' expert report that Plaintiffs retained Dennis North, CPA to render a report. In response to Defendants' Daubert motion, the Court struck North's report finding that, among other things, it did not correctly apply the law, specifically 29 C.F.R. § 778.112, to calculate damages. (*See* DE 407.)

When their expert report was stricken, Plaintiffs attempted, on the eve of trial in April 2007, to submit Rule 1006 summaries of the hours of their damage estimates. Defendants' moved to strike the exhibits. At the second pretrial conference on April 19, 2007. The Court reviewed the summaries and held that they did not satisfy the requirements of Rule 1006 because they (1) did not divide total weekly compensation by total hours compensable for that week; (2) provided unsupportable av-

---

**9.** Defendants' May 13, 2005 offers to Plaintiffs Powell, Betancourt, McIntyre and Sarfaraz as well as the ultimate amount recovered are as follows: (1) Powell—$27,000 offered, $15,530 recovered; (2) Betancourt—$3,000 offered, $2,500 recovered; (3) McIntyre—$32,650 offered, $5,500 recovered; (4) Sarfaraz—$14,000 offered, $2,500 recovered. The par-

ties have not presented evidence of any preliminary offers to the other 11 Plaintiffs.

**10.** For example, if the regular rate is $5.00: under § 778.109 the overtime rate is $7.50; and under § 778.112, the overtime rate is $2.50.

erages for the amount of hours worked by each Plaintiff;[11] and (3) were based on North's expert report which had been stricken. (*See* DE 422.)

In the Order striking Plaintiffs' summaries, the Court required Plaintiffs' counsel to submit revised summaries that satisfied the requirements of Rule 1006 by April 20, 2007. (*See* DE 422.) Plaintiffs submitted new summaries which purported to identify each Plaintiff's unpaid overtime wages on a weekly basis. However, the Court granted Defendants' second motion to strike these as well stating the summaries could not be admitted because of severe issues as to their accuracy and such would unfairly prejudice Defendants at this stage in the litigation. (*See* DE 431.) The Court also noted that Plaintiffs had maintained throughout this litigation that it was impossible to calculate hours worked without using averages, yet five days before trial, Plaintiffs were able to provide the Court and opposing counsel with detailed figures of the actual hours worked. Plaintiffs' counsel's actions in demanding grossly inflated and totally unsupported damage claims and ignoring settled law, as well as his inability to prepare proper evidence for trial despite repeated counseling warrant a reduction in the attorneys' fee award.

c. Plaintiffs' Counsel's Inability To Comply With Rules Of Evidence And Court Orders Resulted In The Appointment Of A Special Master

Beginning in February 2007, the Court repeatedly had to instruct Plaintiffs' counsel to pare down the exhibit and witness lists to those relevant to the disputed issues in this case. In the parties' February 9, 2007 pretrial stipulation, Plaintiffs' lists, which appeared to have been copied from another case, indicated that Plaintiffs intended to introduce over 800 exhibits and to call over 90 witnesses. (*See* DE 338.) The Court reviewed the submission at the February 26, 2007 status conference in light of the triable issues and required Plaintiffs to submit pared down versions by the end of March. On March 27, 2007, Plaintiffs submitted a "revised" exhibit list that still contained over 800 exhibits and a "revised" witness list that included over 60 witnesses that they intended to call at trial. (*See* DE 397, 398.) At the April 5, 2007 pretrial conference, the Court again instructed Plaintiffs' counsel to revise the witness and exhibit lists and to indicate the amount of testimony time needed for each witness. (*See* DE 406.) The Court also implemented a schedule for exchanging the parties' summary exhibits and witness lists with Defendants so that they would be prepared by the April 19, 2007 status conference, which was scheduled specifically for this purpose. (*See id.*)

After reviewing the second revisions of the exhibit and witness lists as well as the "summary" exhibits and considering the amount of time that the Court had previously devoted to assisting the Plaintiffs ensure that the case was trial ready, and the additional close supervision needed to ensure an efficient trial, the Court appointed, with the parties' consent, a special master.[12] (*See* DE 421, 422.) The Court specifically tasked the special master with

---

11. For example, the summaries indicated that Plaintiff Alba had worked 72 hours a week for the 124 weeks he was affiliated with Defendants despite Plaintiffs' counsel's in-Court representation that he did not work 72 hours during many of the weeks.

12. In substance, the Court appointed the special master to aid Plaintiffs' lead counsel learn the procedures for preparing for trial, including the organization of relevant evidence and the calculation of damages, and to help him learn to present the legal aspects of the case to a court.

"aiding the parties in resolving objections to deposition designations, determining the reliability of summary exhibits, eliminating irrelevant or cumulative evidence and resolving any other issues or disputes relating to the parties' witness and exhibit lists." (*See* DE 421.) The special master's involvement in the case resulted in the removal of 22 witnesses from the previous witness list and countless exhibits associated with those witnesses. (*See* DE 432.) However, as mentioned, notwithstanding the special master's involvement, Plaintiffs' summary exhibits, purporting to calculate damages did not meet the standards of Fed.R.Evid. 1006 and were stricken.

In summary, Plaintiffs' counsel's inability to take the necessary steps to efficiently and cost effectively present this case to a jury, and his disregard for both the governing rules and the Court's Orders, resulted in wasted time and expense, including the costs associated with the appointment of a special master. Moreover, Plaintiffs' counsel's tactics and approach delayed Plaintiffs' ability to recoup unpaid overtime wages in a timely fashion.

### 2. Plaintiffs' Filings

The docket in this case contains in excess of 500 docket entries. Throughout, Plaintiffs filed multiple motions that often

were a waste of time, money and resources. Furthermore, the submitted work product was frequently sloppy, inaccurate and reflected poor legal analysis or did not follow the Court's Orders and instructions.

Time and time again, Plaintiffs filed motions that were either denied or failed to further the case in any respect and led to months of unnecessary litigation.[13] Just four examples of Plaintiffs' counsel's modus operandi include the following: (1) his actions regarding a collective action; (2) his wasteful summary judgment motions, (3) his motion for reconsideration; (4) and his wish to add a Defendant after offers of judgment had been accepted. Based on a review of the time records, Plaintiffs' counsel may not have sought compensation for the time associated with these motions. However, the examples illustrate the type of conduct that justifies the downward adjustment to the fee application.

#### (a) Collective Action Conduct

At the outset of the instant lawsuit, Plaintiffs moved to permit Court-supervised notice to pursue this action as nationwide collective action. The Court was aware, however, that Plaintiffs had attempted on numerous occasions in other lawsuits to form a nationwide class of Carey limousine drivers for purposes of suing

---

13. Some examples of these motions include: (1) Plaintiffs' Motion to Permit Court Supervised Notice [DE 4]; (2) Plaintiffs' Motion to Strike Previously Undisclosed Exhibits from Defendants' Exhibit List [DE 94]; (3) Plaintiffs' Motion to Strike Motor Carrier Defense and Motion for Sanctions [DE 95]; (4) Plaintiffs' Motion to Strike Defendants' Reply Brief [DE 108]; (5) Plaintiffs' Motion to Strike Defendants' Submission that Violates the Local Rules [DE 289]; (6) Plaintiffs' Motion to Re-Open Case as to Arbitration Plaintiffs [DE 314]; (7) Plaintiffs' Motion for Extension of Time to File Joint Pretrial Stipulation [DE 327]; (8) Plaintiffs' Motion for Joinder [DE

458]; and multiple motions in limine in the days prior to trial. Furthermore, Plaintiffs' counsel's repeated practice of objecting to and briefing every motion, including the most trivial of issues such as extensions of time, caused wasteful expenditure of time and resources. For example, at the outset of this litigation, the parties extensively briefed with lengthy memoranda a notice of pendency of related case, which does not require any briefing, and several motions for extensions of time, which are routinely granted without the need for memoranda in support (*See* DE 8, 10).

under the FLSA, and that Judge Ungaro had denied several of these motions. (*See* DE 139.) Moreover, in the instant case, Plaintiffs had submitted only one notice of consent form from an employee outside the Miami/West Palm Beach area, did not support their motion with affidavits describing their pay and working conditions, and failed to provide any evidence that Carey International had a nationwide compensation policy.[14] Finally, the Court noted its concern about Plaintiffs' counsel's ability to adequately represent the interests of a class stating that "even if Plaintiffs had shown that a nationwide class action would be appropriate, they would have to obtain substitute class counsel before this Court would have conditionally certified a class." (*See* DE 139.)

(b) Wasteful Summary Judgment Motions

The Court closely involved itself in the management of this case in an effort to avoid the contentiousness of the extensive earlier litigation between Plaintiffs' counsel and defense counsel involving other limousine drivers of Defendants. Because of the briefing problems on the motion to dismiss, the Court held a hearing to discuss the issues that would be raised on summary judgment and the manner in which they would be addressed before the motions were filed. Specifically, the Court admonished the parties to confer and exercise restraint in filing summary judgment motions—they should focus on unresolved legitimate legal issues, keeping in mind that disputed issues of fact preclude summary judgment. The latter instruction was especially germane in light of the fact that Judge Ungaro had resolved many issues in a prior FLSA overtime wage case involving plaintiff limousine drivers, Defendants and the same counsel.[15] *Rodriguez, et al. v. Carey Int'l, Inc.*, case no. 03–22442–Civ–Ungaro (S.D.Fla. November 10, 2004).[16]

However, notwithstanding Judge Ungaro's prior rulings, Plaintiffs' first summary judgment motion re-raised the issues that Judge Ungaro previously resolved. Specifically, Plaintiffs moved for summary judgment as to the method of calculating damages, whether time spent driving to

14. Indeed, in addressing Plaintiffs' counsel's lack of proper support for their motion, the Court included a footnote from a report of Magistrate Judge Klein that outlined Plaintiffs' counsel's repeated improper conduct in this area. Judge Klein stated:

Plaintiffs' counsel has been given numerous opportunities through discovery to establish the requirements for a nationwide class. He has been handed a roadmap and a how-to manual in the form of previous rulings and case law. Instead, he has filed successive lawsuits, each time offering a new irrelevant morsel in an abortive attempt to create a nationwide class action. All of these facts which he has claimed were 'new information' were available to him in the earlier cases filed by counsel. Discovery was available to him. Now the time has come to put counsel on notice that if another suit is filed seeking nationwide class certification on the basis of information that was previously available, or in contravention of previous orders or findings, that he faces the real prospect of sanctions under Fed.R.Civ.P. 11 or 18 U.S.C. § 1927.

15. In her November 11, 2004 Omnibus Order, Judge Ungaro ruled on the following issues: (1) the proper method for calculating the plaintiffs' overtime rate; (2) whether time spent driving to work was compensable; and (3) what payments to include in calculating the plaintiffs' regular rate. (*See* 03–22442–Civ–Seitz, DE 397.)

16. It appears that Judge Ungaro also experienced Plaintiffs' counsel's abusive filing practices in the previous case as she noted in her September 8, 2004 Order, in reference to several motions to strike the plaintiffs filed in that case, that it was "simply further evidence of Plaintiffs' unexplained and unwarranted duplication of motions in these proceedings." (*See* 03–22442–Civ–Ungaro, DE 238.)

work was compensable and how to calculate the regular rate. (*See* DE 274.) Not surprisingly, Plaintiffs' arguments were rejected. Moreover, for those issues where questions of material fact existed, such factual disputes should have been readily apparent to Plaintiffs under well-settled law. Additionally, Plaintiffs' second summary judgment motion included eight separate issues and Plaintiffs' counsel often devoted only a single paragraph of argument to a particular claim causing the Court to expend its own resources to resolve the issues. (*See* DE 241.) Moreover, Plaintiffs' counsel actually moved for summary judgment on issues that Defendants had conceded for the purposes of this case such as whether Defendants violated FLSA.

### (c) Motion For Reconsideration

A few months after the Court had granted Defendants' motion to sever and compel arbitration as to eight Plaintiffs, Plaintiffs moved the Court to re-open the case as to these Plaintiffs arguing that the costs of arbitration prohibited exercise of their FLSA rights. The Court construed Plaintiffs' motion as one for reconsideration under Fed.R.Civ.P. 60(b) and found it meritless not only because Plaintiffs' unrealistic damage estimates were the reason for the high arbitration costs, but also because Defendants had agreed to advance the arbitration fee to Plaintiffs.[17] (*See* DE 324.)

### (d) Motion To Add Party

Even after having accepted offers of judgment, in another example of improper motion practice, Plaintiffs moved to add non-party Chartwell Investments, Inc. to the action. The Court ruled that the addition of Chartwell at such a late stage in the litigation would be a blatant violation of due process, and that Plaintiffs' allegation that they feared they would be unable to collect the accepted offers of judgment was not supported by the record.[18] (*See* DE 468.)

In summary, Plaintiffs' actions forced Defendants to respond to each filing to clarify the facts and the law and required the Court to schedule extra hearings, supervise special sessions with the special master and expend an excessive amount of resources on a single case. Such actions require a reduction in the ultimate fee award.

### B. Calculating the Lodestar

As stated above, Plaintiffs' counsel seeks a total of $481,887. The following is a breakdown of the fees sought:

| | | |
|---|---|---|
| Lloyd Glasser ("Glasser"): | $ 21,915 | ($450/hours × 48.7 hours) |
| Harry Boreth ("Boreth"): | $ 45,630 | ($450/hour × 101.4 hours) |
| Chris Kleppin ("Kleppin"): | $414,342 | ($270/hour × 1,534.6 hours) |
| Total | $481,887 [19] | |

For the reasons discussed, the Court must discount entirely the application of Boreth and Glasser. As to Kleppin, the Court must reduce the billable rate to reflect more accurately the prevailing rate for someone of his experience and the quality of his work product.

---

**17.** In addition, Plaintiffs moved to include the severed Arbitration Plaintiffs in the February 2007 mediation. However, the Court directed Plaintiffs to the Order severing the Arbitration Plaintiffs' claims in which it stated that all further proceedings regarding these Plaintiffs, including the mediation, were stayed pending arbitration. (*See* DE 324.)

**18.** Indeed, defense counsel Alex del Russo, represented as an officer of the Court that the offers of judgment would be paid.

**19.** Plaintiffs' application for attorneys' fees states that Glasser and Boreth "have decades of experience," and Kleppin has been practicing for four years and two months.

### 1. Boreth and Glasser

Plaintiffs' counsel asks for a $450 per hour rate for Boreth and Glasser for their combined 150.1 hours of work. The Court does not question that the range of customary rates for lawyers with the years of experience of Boreth and Glasser includes the rate of $450. The Court cannot award a fee for their time, however, because their participation did not further the prosecution of this action or effectively aid in resolving this dispute. Kleppin was the counsel in this case. When it was obvious to the Court that he needed the benefit of guidance and judgment of more experienced counsel, the Court required Boreth to attend hearings with Kleppin. However, as described above, counsel's combined years of experience did not prevent Kleppin from seriously faltering in the prosecution of this action. In fact, at the various hearings he was required to attend, Boreth either did not participate or did not provide the kind of mentorship to Kleppin that the Court had hoped for and there is no evidence that he in any way aided in the resolution of this matter. The Court understands that Boreth's medical issues may have prevented his participation, however, given the fact that the majority of his time entries are for mere attendance at the various hearings, the

Court cannot justify compensating Plaintiffs' counsel for this time.

With regard to Glasser, in addition to his failure to guide Kleppin through the prosecution of this action, the time entries reveal that his participation was primarily related to the various mediations and other settlement negotiations on the eve of trial. (Plaintiffs' Motion, Ex. 5.) However, there is nothing in the record that reflects that Glasser's participation in this process was either necessary to the mediation or that it helped resolve the case during the period of his involvement. Thus, because Boreth and Glasser did not provide any record evidence of a benefit to the resolution of this matter, compensation for the time spent on this matter shall be denied.

### 2. Kleppin: Hourly Rate

Plaintiffs seek a rate of $270 per hour for Kleppin. In support of this rate, Plaintiffs state that he "exhibited outstanding skill, which is apparent from the filings in the docket that resulted in the Final Judgments in favor of their clients for approximately $300,000.00." However, as discussed above, Plaintiffs' strategy of seeking exorbitant, unsupported damages, filing many unnecessary motions and doing so in a careless manner, actually resulted in four of the Plaintiffs receiving less in damages than was offered prior to the litigation of this matter.[20]

---

20. In support of Kleppin's rate, Plaintiffs submit the affidavit of attorney Peter T. Mavrick who states that Kleppin's rate is reasonable in light of the results attained. (Plaintiffs' Motion, Ex. 1 at 5.) It is noteworthy, however, that Mr. Maverick served as plaintiff's counsel in *Carlson v. Bosem*, Case No. 04–61004, 2007 WL 1496693 (S.D. Fla. April 9, 2007), the previously mentioned FLSA case before Judge William J. Zloch. In that case, Judge Zloch stated the following:

Mavrick's unwillingness or inability to settle this matter was an unreasonable course of behavior in a direct attempt to garner greater fees from this action. This case was

not a complex matter: [the plaintiff] claimed she was owed overtime wages and in [the defendant's] Answer [] he [sic] admitted as much. The only question that remained for litigation was [the plaintiff's] damages, with a variance of a couple thousand dollars between the parties. Yet, the parties allowed this relatively simple matter to erupt into a prolonged and bitter fight that occupies 276 filings, hundreds of thousands of dollars in litigation fees, and an untold burden on the Court's scarce judicial resources.

*Id.* at 7. There is an ironic similarity in the approach of both Kleppin and Maverick that

█ Based on the quality of the papers filed, the in-court presentations and the repeated lack of familiarity with his evidentiary obligations, Kleppin's performance was more akin to a new associate and the customary rate in the community for all associates is in the range of $150 to $350. (Defendants' Response, Ex. 40 (survey of legal fees in Miami area)) The Court has exercised its own independent judgment concerning what rates are appropriate. A court "is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Norman*, 836 F.2d at 1303. Based upon the record, Kleppin's limited years in the Florida Bar, Kleppin's performance in this matter, and the fact that certain Plaintiffs actually received less than what was originally offered to them in pre-litigation negotiations, the Court finds that a rate of $175 per hour the most appropriate hourly rate for Kleppin.

### 3. The Number of Hours Expended

Kleppin's lodestar amount at a $175 hourly rate for 1,534.6 hours of work would be $268,555. (*See* Plaintiffs' Motion, Ex. 5.) However, for the following reasons,

the Court may not rely on Plaintiffs' fee application. *See Hensley,* 461 U.S. at 437, 103 S.Ct. 1933 (stating that "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly.") It improperly includes the following defects: (1) time for unnecessary work, (2) block billing, (3) lack of specificity, and (4) excessive time.

█ First, Plaintiffs' counsel seeks to be compensated for activities which were not necessary to the litigation. *See Hensley,* 461 U.S. at 434, 103 S.Ct. 1933 (stating that a district court should exclude from its initial fee calculation hours that are unnecessary). Specifically, Plaintiffs' counsel seeks compensation for activities that took place because of the parties' inability to communicate. For example, the parties spent time drafting and responding to multiple motions that could have been worked out through professional communication with each other and which would have eliminated the need for Court intervention.[21] Additionally, given the breakdown in communication, counsel constantly drafted letters to address issues that did not warrant such expenditure of time when a telephone call would have accomplished the task more efficiently.[22] Plaintiffs' counsel's overall inability to communicate with defense counsel unnec-

---

is contrary to basic professionalism as well as the spirit of Rule 1 of the Federal Rules of Civil Procedure. Thus, given Maverick's reputation in the legal community, the Court gives no weight to his affidavit.

21. Some examples of these filings include: (1) motions for extension of time (6/8/05, 10/13/06, 10/23/06, 10/25/06, 10/26/06); (2) motions to stay discovery or for confidentiality (7/22/05, 1/17/06); (3) motions to strike (10/19/05, 12/29–30/05, 1/16/06, 4/18/07); (4) emergency motions (11/15/05, 9/11/06); (5) supplemental motions to compel (10/12/05, 11/17/05); (6) a motion to exceed page limitations (12/5/06); (7) a motion for clarification (12/13–14/06); and (8) motions in limine (2/22/07, 3/27/07). (*See, e.g.,* Plaintiffs' Motion, Ex. 5.)

22. Plaintiffs' counsel's time sheets are replete with time spent reviewing or drafting letters to opposing counsel related to minor issues. The following are a few examples of such time entries: (1) letters regarding time limits or page limitations (8/4/05, 9/8/05); (2) letters regarding the initial joint scheduling report (8/9–30/05); (3) letters regarding unnamed documents (10/7/05, 10/10/05) (3) a letter regarding service of process (11/3/05); (4) a letter about conferrals (1/6/06); a letter about the errata sheets (1/13/08); a letter about initial disclosures (3/30/06); a letter about amending the complaint (5/16/06) and many others. (*See. e.g.,* Plaintiffs' Motion, Ex. 5.) Both sides' counsel's distrust of opposing counsel was patent. Yet, even when the Court attempted to eliminate the opportuni-

essarily increased the costs of the litigation and, as such, he cannot benefit from these actions.

Second, Plaintiffs' counsel's time entries are replete with instances of block billing. *American Civil Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 429 (11th Cir.1999) (criticizing block billing). For example, on July 22, 2005, counsel Kleppin makes the following 12.7 hour time entry: "Drafted Response to Motion to Stay Discovery; drafted Motion for Response to Confidentiality Order; Drafted First Amended Complaint." (*See* Plaintiffs' Motion, Ex. 5 at 5.) Again, on November 30, 2006, Kleppin provides the following description of his work totaling nine hours:

> Draft part of Motion for Summary Judgment re Damages; Draft part of statement of Facts in Support of Motion; review some deposition testimony from the Plaintiffs re the tasks that they performed; review deposition of Hernan Zapata.

(*See id.* at 54.) Indeed, a cursory review of Plaintiffs' counsels' time entries yields in excess of 50 instances of block billing similar to those described above.

Third, the majority of the time entries lack specificity. *See Scelta v. Delicatessen Support Services, Inc.*, 203 F.Supp.2d 1328, 1334 n. 2 (M.D.Fla.2002) (stating that time entries that are vague or unclear are not compensable). For example, in July 2005, Plaintiffs' counsel includes several entries with the description "Phone call with office re: various issues." (*See* Plaintiffs' Motion, Ex. 5 at 4.) Upon reviewing these time entries, the Court is unable to discern what counsel did. Also, on April

17, 2007, counsel Kleppin states that he spent 4.7 hours "[p]reparing for pretrial conference." (*See id.* at 72.) Counsel fails to specify what he accomplished in this time block so that the Court can determine whether it was necessary. Furthermore, it is noteworthy that counsel's performance at the April 19, 2007 status conference, which was the second pretrial conference that the Court was required to schedule due to Plaintiffs' counsel's lack of preparation, contributed greatly to the appointment of the special master. (*See* DE 422.) Finally, the 70 pages of time entries include countless references to such activities as "[D]raft letter re addresses and phone numbers" or "[p]hone call with LSG re various issues" which fail to aid the Court in determining whether the expenditure of time was proper or necessary. (*See id.*)

■ Fourth, Plaintiffs' counsel spent excessive time, 120 hours, on such things as witness/exhibit lists that resulted in the appointment of a special master and damage summaries that were ultimately not admitted due to sloppiness and irrelevancy. Even at Plaintiffs' counsel's discounted hourly rate of $175/hour, that equates to $21,000 spent on activities that did not further the Plaintiffs' case. Moreover, Plaintiffs' counsel's inability to pare down the witness/exhibit lists and create damage summaries for trial, resulted in three pretrial conferences and the appointment of a special master.[23] Additionally, Plaintiffs' counsel's time sheet is replete with entries of .1 hour or .2 hours for tasks that could not possibly take that amount of time. For example on page 3 of the time entries, Plaintiffs' counsel had nine separate time

---

ties for miscommunications, Plaintiffs' counsel could not let go of the past. Moreover, he continued to give opposing counsel a basis to distrust him. Counsel's emotional involvement in the case clouded his independent judgment and resulted in a pattern of "tit for tat" that makes it impossible to determine the

benefit of the activities for which he seeks to be compensated.

**23.** The special master represents that he spent 22.5 hours working with the parties to prepare the exhibit and witness lists for trial.

entries for less than twelve minutes. (*See* Plaintiffs' Motion, Ex. 5 at 3.) Such entries include twelve minute billing periods for such things as reviewing an Order that is one paragraph long (*see id.* June 9, 2005 entry) or reviewing a two-line Order granting an extension of time (*see id.* at 7, September 8, 2005 entry). In fact, throughout the 70–pages of time records, Plaintiffs' counsel include over 520 separate entries for activities taking less than 12 minutes long making it difficult for the Court to determine if such time is reasonable or excessive.[24] (*See, generally, id.*)

In summary, Plaintiffs' time records are deficient in several different ways, and such deficiencies are prevalent throughout the 70 pages of entries. Thus, Plaintiffs have not adequately supported their request for attorneys' fees and a reduction is necessary.

### 4. Adjustments for the Results Obtained

The Supreme Court has stated that "the extent of a plaintiff's success is a crucial factor that the district courts should consider carefully in determining the amount of fees to be awarded." *Hensley,* 461 U.S. at 438 n. 14, 103 S.Ct. 1933. In this case, in light of the fact that the fifteen Plaintiffs at one point demanded damages in excess of $15 million and ultimately accepted offers of judgment in an amount totaling $294,140, this case merits

a reduction for limited recovery. Furthermore, Plaintiffs' counsel's handling of this action, including his refusal to aid in settlement of this case in the early stages, his inability to prepare the matter for trial and his improper fee application, bolsters the need for a downward adjustment.[25]

The Supreme Court has recognized the difficulty in reducing the lodestar to an amount that is reasonable in relation to the amount obtained and has counseled that the reduction may be accomplished by either "identify[ing] specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Hensley,* 461 U.S. at 436–37, 103 S.Ct. 1933. Given the multiple deficiencies with Plaintiffs' counsel's time records, the Court shall simply make a percentage reduction.

The Eleventh Circuit has upheld reductions under similar circumstances. In *Popham,* for example, the plaintiff prevailed on his excessive force claim, but not his other claims. The *Popham* Jury awarded $30,000 in damages, where the plaintiff requested $2,000,000. The district court awarded attorney's fees in the amount of $16,965.15, representing a 67% reduction, which the Eleventh Circuit upheld. *Popham,* 820 F.2d at 1581. Similarly, in *Andrews,* the Eleventh Circuit emphasized how important it was for a district court to consider the extent of the

---

**24.** Plaintiffs' counsel also cannot be compensated for work that is clerical or duplicative. *Gates v. Barnhart,* 325 F.Supp.2d 1342, 1348 (M.D.Fla.2002) (stating that "tasks of a clerical nature are not compensable as attorneys' fees"); *Scelta,* 203 F.Supp.2d at 1334 n. 2 (deducting duplicative time entries). Plaintiffs' counsel includes a few time entries seeking to recover for faxing or calendaring dates. (*See id.*: January 31, 2006 entry; June 15, 2006 entry). Additionally, counsel's time sheet appears to include duplicative time entries. For example, on January 28, 2007, counsel entered two separate entries for reviewing the same documents relating to Plain-

tiff Donahay. (*See id.* at 59.) It also appears that on both September 25, 2006 and September 28, 2006, counsel met with John Humphreys to prepare for depositions for 3.1 and 3.3 hours respectively. (*See id.* at 42.) While it is conceivable, that such entries are not duplicative but rather consecutive, such distinction should have been adequately described in the time entry.

**25.** At this point the Court merges the discussion of hourly deductions and the reduction of the overall fee award for the results obtained.

plaintiff's success. In *Andrews*, the plaintiffs initially sought $3.5 million and ultimately prevailed in a jury verdict recovering only $49,549. Although the district court had reduced the fee award by 78%, the appellate court remanded the case because the district court awarded fees for success on all the CERCLA claims, even though the plaintiffs only succeeded on one claim. *Andrews*, 122 F.3d at 1375 (stating that "[w]here the plaintiff has achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.")

In this case, because Plaintiffs have sought such varied amounts over the course of the litigation, it is difficult to ascertain the exact percentage that was actually recovered. However, at one point Plaintiffs' requested damage awards exceeded $15 million. Thus, the $294,140 in accepted offers of judgment represents less than a 2% recovery of that demand. While seven of the Plaintiffs ultimately received awards ranging from $25,000 to $62,000, the rest received much smaller awards, including five awards under $2,510. Furthermore, not only was the actual judgment total a fraction of the $15 million demand, four of the Plaintiffs actually received less than Defendants' pre-litigation settlement offer. For example, Plaintiff McIntyre received less than 17% of what he was initially offered and Plaintiff Sarfaraz received less than 18% of what he was initially offered. Thus, given the limited results obtained compared to the initial awards sought, and the fact that some Plaintiffs were actually financially harmed by the litigation, the Court finds that a 67% reduction in fees is appropriate, akin to the reductions in both *Popham* and *Andrews*.[26] In coming to this conclusion,

the Court has carefully followed the Eleventh Circuit's admonition that the amount of attorneys' fee recovered should not be a strict proportion of the amount of damages the plaintiff recovered. *Andrews*, 122 F.3d at 1376. Accordingly, the amount of attorneys' fees the Court finds to be reasonable and appropriate under the circumstances is $88,623.15. ($268,555 × 33%)

While it is not a small amount of fees, the Court has kept two facts in mind. First, the fee shifting provisions of the FLSA were designed so that Plaintiffs could still recover under the statute despite the small monetary nature of their claims. Second, the Defendants' conduct in vigorously defending this case did contribute to the price tag on the attorneys' fees award. Defendants' defense necessarily required Plaintiffs' counsel to expend time and effort and such drives up the ultimate charge of attorneys' fees billed to a non-prevailing defendant. *See e.g. Rice v. Sunrise Express, Inc.*, 237 F.Supp.2d 962, 977 (S.D.Ind.2002). Weighing all the factors discussed above, the Court finds that the above amount represents a fair, equitable and reasonable amount of attorneys' fees in light of the purposes behind the FLSA and other similar fee shifting statutes, as well as Plaintiffs' limited success notwithstanding the plethora of hours expended litigating this case.

**C. Plaintiffs' Motion for Sanctions Against Defense Counsel and Motion to Strike Defendants' Response to Plaintiffs' Motion for Attorneys' Fees and Plaintiffs' Motion for Sanctions Against Non-party Samuel Terilli**

By their motions, Plaintiffs complain that Defendants improperly filed as an

---

26. In *Carlson*, the court having found that the plaintiff's counsel engaged in almost identical misconduct, discounted the attorneys' fee

award by almost 97% ($4,725 awarded and $140,310 requested.) (*See Carlson*, Case No. 04–61004–Civ–Zloch, DE 215, 278.)

exhibit to their response to Plaintiffs' fees motion, the affidavit of Samuel Terilli, which tangentially relates to statements made at mediation. Plaintiffs argue that such inclusion is a violation of the Local Rules for the Southern District of Florida, Florida state law, the Court's Orders and federal case law, and seek sanctions against defense counsel and non-party Samuel Terilli under the Court's inherent power. Plaintiffs also seek to have Defendants' response in opposition to Plaintiffs' motion for attorneys' fees stricken from the record.

Plaintiffs' motions in this regard serve as another example of the wasteful, nonproductive tactics Plaintiffs' counsel employed. Plaintiffs' complaint is that Mr. Terilli's affidavit, filed on July 3, 2007, includes confidential statements from the first mediation, one of which relates to Plaintiffs' counsel's alleged failure to advise his clients about damages and the law, stating: "[o]ne can only conclude this was not done in this case at this point, or alternatively that Plaintiffs' counsel wanted the litigation to continue given that the Plaintiffs demanded on average about $750,000.00 in the first mediation." [27] (Plaintiffs' Opposition, Ex. 2.) Defendants, on July 9, 2007, cured the mistake by filing a notice of striking the originally filed affidavit and submitting a new affidavit without reference to the mediation. (*See* DE 506, 507, 510.) Notwithstanding defense counsel's quick action to correct this error, Plaintiffs' counsel Boreth sent defense counsel a letter on July 13, 2007 in reference to both the original and the revised Terilli Affidavit stating "in the event you do not withdraw the Defendants' Memorandum of Law In Opposition, the two Affidavits referred to herein *and consent to Plaintiffs' attorneys' fee request* [$481,887], we will be left with no alternative but to file the appropriate motion." (Defendants' Opposition to Sanctions, Ex. C (emphasis added))

The key to unlocking a court's inherent power to impose a sanction is a finding of bad faith. *See Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998) (citing *In re Mroz,* 65 F.3d 1567, 1575 (11th Cir.1995)). "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *See id.* (citing *Primus Automotive Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir.1997)).

The record is totally devoid of evidence of bad faith on defense counsel's part in this regard. Defendants, upon realizing that the Terilli Affidavit improperly referred to figures presented at mediation, took expedient measures to cure the mistake. Indeed, when Boreth sent the letter to defense counsel, the error had already been cured.[28] In short, the inclusion of the information was not an attempt to gain an

---

**27.** After filing their response to Plaintiffs' application for fees [DE 503], Defendants filed a revised affidavit of Mr. Terilli [DE 505] attaching an omitted affidavit. Both affidavits included the pertinent statement regarding mediation.

**28.** Not only does the motion lack evidentiary support, which someone of Boreth's level of experience should and could have easily realized, it causes concern as the manner in which Plaintiffs' counsel attempted to profit from defense counsel's error is tantamount to extortion. Boreth demanded that Defendants pay their attorneys' fees in total or else Plaintiffs would file these two sanctions motions. Such conduct is in direct conflict with the minimal standards expected of members of The Florida Bar and would be deserving of a sanction. However, the fee awarded in the this matter takes such conduct into consideration.

advantage over the Plaintiffs, but rather an error which counsel cured. Moreover, Plaintiffs cannot be prejudiced by the release of such information, as there is considerable evidence in the record that Plaintiffs sought inordinately high damage awards throughout this litigation. Indeed, the majority of Defendants' opposition is dedicated to this fact, and Plaintiffs, until the filing of the Terilli Affidavit, did not, nor could they in good faith, object to such record evidence. Thus, Plaintiffs' motion for sanctions, both against defense counsel as well as Samuel Terilli, must be denied.

### III. Conclusion

For the reasons set forth herein, it is hereby

ORDERED that

1. Plaintiffs' Motion for Attorneys' Fees [DE 486] is GRANTED IN PART AND DENIED IN PART.

2. Defendants' Motion for Sanctions Against Plaintiffs' Counsel [DE 487] is DENIED.

3. Plaintiffs' Motion for Sanctions Against Defense Counsel and Motion to Strike Defendants' Response to Plaintiffs' Motion for Attorneys' Fees [DE 512, 514] is DENIED.

4. Plaintiffs' Motion for Sanctions Against Non-party Samuel Terilli [DE 513] is DENIED.

5. Plaintiffs' Motion for Sanctions Against Defense Counsel [DE 532] is DENIED.